**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ROBERT CARLYLE,<br><br>       Plaintiff,<br><br>   v.<br><br>AKORN, INC., JOHN N. KAPOOR, KENNETH S. ABRAMOWITZ, ADRIENNE L. GRAVES, RONALD M. JOHNSON, STEVEN J. MEYER, TERRY A. RAPPUHN, BRIAN TAMBI, and ALAN WEINSTEIN,<br><br>       Defendants. | Case No. 17 CV 4455<br><br>**COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Robert Carlyle ("Plaintiff"), by his undersigned counsel, alleges upon personal knowledge as to himself and upon information and belief, based upon, among other things, his counsel's investigation, as to all other allegations herein, as follows:

<u>**SUMMARY OF THE ACTION**</u>

1.     This action is brought by Plaintiff, a holder of the common stock of Akorn, Inc. ("Akorn" or the "Company"), against Akorn and Akorn's Board of Directors (the "Individual Defendants" or the "Board"), for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78n(a) and 78t(a), and rules and regulations promulgated thereunder, including Rule 14a-9, 17 C.F.R. §240.14a-9, in connection with the proposed acquisition of Akorn by Fresenius Kabi AG ("Fresenius Kabi"), through Quercus Acquisition, Inc. ("Merger Sub" and, together with Fresenius Kabi, "Fresenius").

2.     Akorn is a Louisiana corporation with its principal corporate offices in Lake Forest, Illinois. Together with its wholly-owned subsidiaries, Akorn is a specialty generic pharmaceutical company that develops, manufactures, and markets generic and branded

prescription pharmaceuticals and branded as well as private-label over-the-counter ("OTC") consumer health products and animal health pharmaceuticals. It is an industry leader in the development, manufacturing, and marketing of specialized generic pharmaceutical products in alternative dosage forms. Akorn specializes in difficult-to-manufacture sterile and non-sterile dosage forms including ophthalmics, injectables, oral liquids, otics, topicals, inhalants, and nasal sprays. It has facilities in several states and foreign countries.

3.     On April 24, 2017, Akorn and Fresenius publicly announced they had entered into a definitive agreement for Akorn to be acquired by Fresenius (the "Proposed Transaction"). Pursuant to the Agreement and Plan of Merger, dated April 24, 2017 (the "Merger Agreement"), Merger Sub will merge with and into Akorn, with Akorn surviving the merger as a wholly-owned subsidiary of Fresenius Kabi. Akorn shareholders will receive $34.00 in cash per share for each share of Akorn common stock they own. According to the Company's press release, the Proposed Transaction is valued at approximately $4.3 billion, plus the assumption of approximately $450 million of debt. The Proposed Transaction is subject to approval by Akorn shareholders.

4.     The April 24, 2017 joint press release issued by Akorn and Fresenius stated:

**LAKE ZURICH, Ill. and LAKE FOREST, Ill.**, April 24, 2017 – Fresenius Kabi has agreed to acquire Akorn (NASDAQ: AKRX), a U.S-based manufacturer and marketer of prescription and over-the-counter pharmaceutical products, for approximately $4.3 billion, or $34.00 a share, plus the assumption of approximately $450 million of debt1. The transaction is expected to close by early 2018 and to be accretive in 2018 to Fresenius Group net income and EPS, excluding integration costs.

The agreement and transaction have been approved by the boards of both companies and will be recommended by Akorn's board to its shareholders. Akorn's largest shareholder has committed to supporting the transaction. The transaction is subject to approval by Akorn shareholders and other customary closing conditions, including regulatory review under the Hart-Scott-Rodino Antitrust Improvements Act.

"Joining our two companies and product portfolios will strengthen and diversify both businesses," said John Ducker, president and CEO of Fresenius Kabi USA. "Akorn brings to Fresenius Kabi specialized expertise in development, manufacturing and marketing of alternate dosage forms, as well as access to new customer segments like retail, ophthalmology and veterinary practices. Its pipeline is also impressive, with approximately 85 ANDAs filed and pending with the FDA and dozens more in development."

"Fresenius Kabi is an excellent fit for Akorn, strategically and culturally," said Raj Rai, Akorn's Chief Executive Officer. "Fresenius brings to Akorn the strength and resources of a global leader with an experienced U.S. team and an outstanding record of growth and award-winning service in the United States. We look forward to working with Fresenius Kabi on this next phase of our growth. When the transaction closes, we will strive to ensure a smooth transition for our employees and customers."

Akorn also announced today that based on a preliminary review of Q1 results, it is reaffirming its previously announced 2017 guidance, excluding any one-time costs related to the transaction with Fresenius Kabi.

Fresenius Kabi specializes in sterile injectable medicines. Akorn produces a diverse portfolio comprising sterile ophthalmics, topical creams, ointments and gels, oral liquids, otic solutions (for the ear), nasal sprays and respiratory drugs in addition to sterile injectables, which made up just 35% of Akorn sales last year.

Akorn products are sold in retail pharmacies (prescription and over-the-counter) and directly to physician and veterinary distributors, in addition to hospitals and clinics – virtually all in North America. Fresenius Kabi is a global health care company with a worldwide network for pharmaceutical and medical devices R&D, manufacturing, sourcing, sales and supply chain that will be a valuable resource to grow Akorn's portfolio in the U.S. and abroad.

The U.S. headquarters for Akorn and Fresenius Kabi are both in Northern Illinois, located in close proximity. Akorn employs more than 2,000 people worldwide. Fresenius Kabi employs more than 30,000 worldwide.

Fresenius Kabi has a successful track record of growing pharmaceutical acquisitions in the United States. Fresenius Kabi acquired APP Pharmaceuticals in 2008 and has more than tripled its sales to nearly $2 billion. The company acquired the Simplist™ line of prefilled syringes from BD last year and has already doubled the sales of this portfolio.

Fresenius Kabi's financial advisers for the transaction were Credit Suisse and Moelis, with Allen & Overy acting as its primary legal adviser. J.P. Morgan Securities LLC served as Akorn's financial adviser, and Cravath, Swaine & Moore LLP and Polsinelli PC served as its legal advisers.

5.     To induce Akorn stockholders, including Plaintiff, to vote in favor of the Proposed Transaction, on May 22, 2017, Defendants filed, or caused to be filed, with the U.S. Securities and Exchange Commission (the "SEC"), a materially false and misleading preliminary proxy statement (the "Proxy") on Schedule 14A in violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

6.     Among other things, the Proxy contains the unanimous recommendation of the Board that Akorn shareholders vote "for" the Proposed Transaction. However, as detailed herein, the Proxy misrepresents and omits material information concerning, among other things: (a) the background and process that led to the Proposed Transaction; (b) Akorn's management's financial projections; (c) the analyses that Akorn's financial advisor, J.P. Morgan Securities LLC ("J.P. Morgan"), performed that purport to support its fairness opinion; and (d) conflicts of interest affecting the Proposed Transaction. Without this omitted information, Plaintiff and other Akorn shareholders are not able to assess the integrity of the process that led to the Proposed Transaction or the adequacy of the proposed consideration.

7.     For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

9.     Venue is proper pursuant to 28 U.S.C. §1391(b) because Defendants systematically conduct business on a regular basis in this District and/or reside in this District, and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District.

4

## PARTIES

10.     Plaintiff is, and was at all times relevant hereto, a continuous stockholder of Akorn.

11.     Defendant Akorn is a Louisiana corporation, with its principal place of business at 1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045.

12.     Defendant John N. Kapoor has served as the Chairman of the Board since October 1990. Defendant Kapoor served as Akorn's interim Chief Executive Officer from March 2001 to May 2002 and as its Chief Executive Officer from May 2002 to December 2002.

13.     Defendant Kenneth S. Abramowitz has served as a Director of the Company since May 2010.

14.     Defendant Adrienne L. Graves has served as a Director of the Company since March 2012.

15.     Defendant Ronald M. Johnson has served as a Director of the Company since May 2003.

16.     Defendant Steven J. Meyer has served as a Director of the Company since June 2009.

17.     Defendant Terry A. Rappuhn has served as a Director of the Company since April 2015.

18.     Defendant Brian Tambi has served as a Director of the Company since June 2009.

19.     Defendant Alan Weinstein has served as a Director of the Company since July 2009.

20.     Defendants Kapoor, Abramowitz, Graves, Johnson, Meyer, Rappuhn, Tambi, and Weinstein are referred to herein collectively as the "Board" or the "Individual Defendants." The Individual Defendants and Akorn are referred to as "Defendants."

5

21.     Non-party Fresenius Kabi is a German stock corporation. Its principal executive office is located at Else-Kröner-Str. 1, 61352 Bad Homburg v.d.H., Germany.

22.     Non-party Merger Sub, a Louisiana corporation, is a wholly-owned subsidiary of Fresenius Kabi and was formed by Fresenius Kabi on April 10, 2017 solely for the purpose of acquiring Akorn. Upon completion of the merger, Merger Sub will cease to exist. Merger Sub's principal executive office is located at Three Corporate Drive, Lake Zurich, Illinois 60047.

23.     Non-party Fresenius Kabi's parent company is Fresenius SE & Co. KGaA ("Fresenius Parent"). Fresenius Parent, a German partnership limited by shares, is a global healthcare group providing products and services for dialysis, hospitals, and outpatient medical care. Its principal executive office is located at Else-Kröner-Str. 1, 61352 Bad Homburg v.d.H., Germany. Its ordinary shares are listed on the Börse Frankfurt under the trading symbol "FRE."

## **DEFENDANTS' WRONGDOING**

### *Akorn's Recent Performance*

24.     On May 16, 2016, Akorn issued a press release reporting its financial results for the first quarter of 2016. The Company announced that consolidated revenue for the first quarter of 2016 was $268 million, an increase of $41 million or 18% over the first quarter 2015 consolidated revenue of $227 million; that GAAP net income was $42 million, compared to $38 million in the first quarter of 2015; that GAAP fully diluted earnings per share ("EPS") was $0.34, compared to $0.31 in the first quarter of 2015; and that adjusted net income was $68 million, or $0.54 per diluted share, a 20% increase over the first quarter of 2015.

25.     Akorn's Chief Executive Officer, Raj Rai, commented[1]:

---

[1] All emphasis is added unless indicated otherwise herein.

*"We are off to a good start to 2016. In the first quarter, we realized a solid organic growth from our portfolio and since December, we have launched five new products.* With the restatement behind us, we are now focused on accomplishing our critical objectives set forth for 2016 as well as increasing our product development efforts for enhancing future growth prospects."

26. On August 4, 2016, Akorn issued a press release reporting its financial results for the second quarter of 2016. The Company emphasized that second quarter 2016 revenues increased 27% to $281 million; that second quarter 2016 GAAP EPS increased 85% to $0.50; and that adjusted second quarter 2016 EPS increased 41% to $0.58. The August 4 press release stated, in part, with regard to the Company's performance:

*Akorn reported revenue of $281 million for the second quarter 2016, a 27% increase from the second quarter 2015.*

*GAAP net income for the second quarter 2016 was $62 million, or $0.50 per diluted share, compared to GAAP net income of $33 million, or $0.27 per diluted share, in the same quarter of 2015.* Including a net adjustment of $11 million to net income for non-GAAP items, adjusted diluted earnings per share were $0.58 in the second quarter 2016, compared to a net adjustment of $19 million to net income for non-GAAP items and adjusted diluted earnings per share of $0.41 in the same quarter 2015.

27. Commenting on the financial results, Akorn CEO Raj Rai stated in part:

"The record second quarter results reflected the strength of our differentiated product portfolio and the efforts of every Akorn associate around the world. We are also pleased to announce that our Board of Directors approved a share repurchase program, authorizing Akorn to purchase up to $200 million of Akorn's outstanding common stock."

28. On November 3, 2016, Akorn issued a press release reporting its financial results for the third quarter of 2016, which included the following highlights:

*Akorn reported net revenue of $284 million for the third quarter 2016, an 11% increase from the third quarter 2015*.

GAAP net income for the third quarter 2016 was $48 million, or $0.38 per diluted share, compared to GAAP net income of $48 million, or $0.39 per diluted share, for the same quarter of 2015. Including a net adjustment of $22 million to net income for non-GAAP items, adjusted diluted earnings per share for the third

quarter 2016 were $0.56, compared to $0.56 in the same quarter 2015, after a net adjustment of $22 million to net income for non-GAAP items.

\*    \*    \*

Earnings before interest, taxes, depreciation and amortization was $117 million for the third quarter 2016 compared to $108 million for the third quarter 2015. Adjusted EBITDA, which is another non-GAAP measure used by management to evaluate the continuing operations of the Akorn business, was $127 million for the third quarter 2016, compared to $125 million for the third quarter 2015.

29.    Commenting on the Company's third quarter results, CEO Rai stated:

"***We are pleased with our third quarter results.*** We remain focused on investing in our company to support future growth endeavors through expansion of our research and development capabilities, modernization of our plants, expansion of our capacities and technology enhancements.

***We expect to finish the year with strong results and momentum***, despite the regulatory challenges and industry headwinds. We completed a $25 million share buyback in the third quarter, however, our focus for capital deployment is on business development opportunities to further enhance our long-term growth prospects."

30.    On March 1, 2017, Akorn issued a press release reporting its financial results for the fourth quarter and full year 2016, which included the following highlights:

***Akorn reported revenues of $284 million for the fourth quarter 2016 representing an increase of $4 million, or 1%, over the fourth quarter 2015. Full year 2016 revenues of $1,117 million represented an increase of $132 million, or 13.4%, over prior year revenues of $985 million.***

\*    \*    \*

***GAAP net income for the full year 2016 was $184 million, or $1.47 per diluted share, compared to GAAP net income of $151 million, or $1.22 per diluted share, in the prior year.*** Including a net adjustment of $99 million to net income for non-GAAP items, adjusted diluted earnings per share were $2.25 in 2016, compared to a net adjustment of $103 million to net income for non-GAAP items and adjusted diluted earnings per share of $2.02 in the prior year ended December 31, 2015.

\*    \*    \*

8

Earnings before interest, taxes, depreciation and amortization ("EBITDA") was $112 million in the fourth quarter 2016, compared to $115 million in the fourth quarter 2015. ***EBITDA was $442 million in the full year 2016, compared to $401 million in the prior year.*** Adjusted EBITDA, which is another non-GAAP measure used by management to evaluate the continuing operations of the Akorn business, was $125 million in the fourth quarter 2016, compared to $135 million in the fourth quarter 2015. ***Adjusted EBITDA was $509 million in the full year 2016, compared to $460 million in the prior year.***

31.     The Company also noted that it had received three Abbreviated New Drug Application ("ANDAs") approvals; that it expanded its R&D footprint "with October opening of new R&D center in Cranbury, NJ"; that it submitted 12 ANDAs to the Food and Drug Administration (the "FDA"); that it received FDA NAI status (No Action Indicated), the highest status level available, for the Company's Decatur, IL facility, following the December 2016 re-inspection; that the Company's three other FDA approved manufacturing sites are in good standing following 2016 FDA inspections; and that it made "significant progress" at Akorn India.

32.     Commenting on the financial results, CEO Rai stated, in part, as follows:

"***We are pleased with our performance in 2016.*** . . . ***In 2016, we achieved record revenues, surpassing a billion dollars and solidifying Akorn's position among the top specialty generics companies with manufacturing roots in the United States***. This would not have happened without the collective efforts and dedication of all Akorn employees.

Our focus in 2017 and beyond remains consistent with our growth strategy of diversifying our portfolio, thus reducing product concentration through harvesting and replenishing our pipeline, deploying capital to consummate smart acquisitions through business development efforts and continuing to invest in our infrastructure. Finally, we remain optimistic about both the short and long-term prospects of our business despite the headwinds in our industry."

***The Defective Sales Process***

33.     Notwithstanding the Company's record revenues and excellent prospects, the Board caused it to enter into the Merger Agreement pursuant to a defective and tainted process and is soliciting shareholder approval based on materially misleading and inadequate disclosures,

9

which prevent Plaintiff and the Company's other public shareholders from relying on the integrity of the process and evaluating the adequacy of the proposed consideration.

34. And, to the detriment of the Company's shareholders, the terms of the Merger Agreement are calculated to dissuade potential suitors, unreasonably, from making a competing offer and substantively favor Fresenius.

35. The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals. *See* Merger Agreement §5.02(a).

36. According to the Proxy (at page 67):

> In the merger agreement, the Company has agreed to, and to cause its subsidiaries and each of its and their officers and directors not [sic] to, and to instruct and use its reasonable best efforts to cause its investment bankers, financial advisors, attorneys, accountants and other representatives to, immediately cease any discussions or negotiations with any parties that may have been ongoing with respect to a takeover proposal and to seek to have destroyed or returned to the Company any information with respect to a takeover proposal that has been provided in any such discussions or negotiations.

The Company also agreed that it will not: (i) directly or indirectly, "initiate, solicit, or knowingly encourage" the submission of any inquiries regarding, or the making of any proposal that constitutes or would reasonably be expected to lead to, a takeover proposal; (ii) furnish to any other person any non-public information in connection with, or for the purpose of, encouraging a takeover proposal; and (iii) enter into any agreement or understanding providing for a takeover proposal. *Id.*

37. Further, the Company must promptly, i.e. within 24 hours, advise Fresenius of any proposals or inquiries received from other parties. The Company must notify Fresenius of

any takeover proposal, the material terms and conditions of such takeover proposal, and the identity of the person making such takeover proposal, and also must provide Fresenius copies of any documents evidencing or delivered in connection with such takeover proposal. Further, the Company must keep Fresenius reasonably informed promptly of any material developments with respect to any such takeover proposal. *See* Merger Agreement §5.02(c).

38.     In addition, the Merger Agreement contains a highly restrictive "fiduciary out" provision that permits the Board to withdraw its approval of the Proposed Transaction only under extremely limited circumstances, requires the Company to give Fresenius at least five business days' prior written notice of its intention to take such action, and grants Fresenius a right to renegotiate the terms of the Merger Agreement to match any "superior proposal." *See* Merger Agreement §5.02(d). The Merger Agreement also grants Fresenius the right to be provided with confidential, non-public information concerning any competing acquisition proposal from a third party and the right to be provided with any non-public information or data provided to a possible competing bidder that was not previously made available to Fresenius, which information Fresenius then could use to prepare a matching bid. *See* Merger Agreement §5.02(b).

39.     Further locking up control of the Company in favor of Fresenius, the Merger Agreement also provides for a "termination fee" of $129 million, payable by the Company to Fresenius if the Merger Agreement is terminated. *See* Merger Agreement §7.03.

40.     In addition, Defendant Kapoor; Raj Rai, Chief Executive Officer; Bruce Kutinsky, Chief Operating Officer; Joseph Bonaccorsi, Senior Vice President, General Counsel and Secretary; and their shareholder affiliates have executed and delivered to Fresenius voting agreements, dated April 24, 2017, pursuant to which they have agreed, among other things, to vote, or cause to be voted, their subject shares in favor of the Proposed Transaction. Altogether, Kapoor, Rai, Kutinsky, and Bonaccorsi, and their shareholder affiliates are the beneficial owners

of more than 30 million shares of common stock of Akorn that are subject to the voting agreements. Accordingly, even before the shareholder vote, nearly 25% of the Company's common stock already is committed to approve the Proposed Transaction.

41.     By agreeing to these deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have effectively precluded other bidders from making a successful competing offer for the Company.

***The Proxy Omits Material Information, Rendering It False and Misleading***

42.     The Proxy, which Defendants filed, or caused to be filed, with the SEC on May 22, 2017, omits material information concerning the Proposed Transaction and, therefore, is materially false and misleading. Without such information, Akorn shareholders are not able to render an informed decision with respect to the Proposed Transaction.

43.     First, the Proxy omits material information with respect to the Company's financial projections and the financial analyses performed by the Company's financial advisors, J.P. Morgan.

44.     Thus, the Proxy refers to "an illustrative financial analysis of the Company's standalone valuation based on public filings and publicly available equity research" that J.P. Morgan presented to the Board at its meeting on February 17, 2016, after which the Board purportedly concluded "it would be in the best interest of the Company and its shareholders to explore potential strategic alternatives . . . ." Proxy at 26. The Proxy, however, fails to disclose any information with respect to the substance of J.P. Morgan's analysis of the Company's stand-alone valuation. Nor does the Proxy disclose exactly why the Board determined it would be in the best interest of the Company and its shareholders to pursue potential strategic alternatives rather than a stand-alone strategic plan.

12

45.     The Proxy also refers to "the potential upside in the Company's stand-alone strategic plan," which the Board purportedly considered in determining to recommend approval of the Proposed Transaction. Proxy at 39. Yet, the Proxy fails to disclose any further information concerning that "stand-alone strategic plan" or its "potential upside" or exactly why the Board determined it would be in the best interest of the Company and its shareholders to pursue potential strategic alternatives rather than a stand-alone strategic plan.

46.     Further, the Proxy refers to a "November 2016 Management Case," which was prepared by the Company's management and presented to the Board. It was also made available to Fresenius "in connection with their review of a possible transaction with the Company." According to the Proxy, the Company's management prepared the November 2016 Management Case for the fiscal years 2017 through 2026 "as part of the development of management's strategic plan and in connection with the Company's review of strategic alternatives." Further, according to the Proxy, "[t]he projections contained in the November 2016 Management Case for the fiscal years 2017 through 2020 were prepared by the Company's management based on management's reasonable best estimates and assumptions with respect to the Company's future financial performance." Proxy at 47. Yet, the Proxy fails to disclose any information concerning the substance of the November 2016 Management Case or the assumptions, analysis, projections, or conclusions reflected therein.

47.     The Proxy also refers to a "March 2017 Management Case" with respect to the fiscal years 2017 through 2026, which was prepared by the Company's management and presented to the Board. According to the Proxy, "[t]he projections contained in the March 2017 Management Case for the remainder of fiscal year 2017 and fiscal years 2018 through 2020 were prepared by the Company's management based on the projections contained in the November 2016 Management Case for the corresponding periods and updated information, assumptions and

estimates . . . ." The Proxy explains that the March 2017 Management Case was prepared by the Company's management "based on the Company's management's reasonable best estimates and assumptions with respect to the Company's future financial performance . . . ." Proxy at 47.

48. Yet, although it purports to provide a summary of the March 2017 Management Case for fiscal years 2017 through 2026, the Proxy fails to disclose complete information concerning the substance of the March 2017 Management Case or the assumptions, analysis, projections, or conclusions reflected therein.

49. Among other things, according to the Proxy, the projections for fiscal years 2021 through 2026 were prepared "by applying a growth rate determined based on a number of factors to the projected fiscal year 2020 revenue, which growth rate was then decreased year-over-year following fiscal year 2021, and by applying adjustments to EBITDA margin from the projected fiscal year 2020 based on the reasonable judgment of management . . . ." The Proxy, however, fails to disclose the growth rate used, the basis for that growth rate, the basis for decreasing the growth rate following fiscal year 2021, or the adjustments to EBITDA margin from the projected fiscal year 2020. Nor does the Proxy disclose the Company's projected net income after deducting for net interest expense, income tax expense, depreciation, amortization, and stock-based compensation expense.

50. The Proxy notes that J.P. Morgan reviewed "certain internal financial analyses and forecasts prepared by the management of the Company relating to its business." Proxy at 41. Yet, the Proxy fails to disclose exactly what financial analyses and forecasts the Company's management prepared or the substance of those analyses and forecasts.

51. Also with respect to the March 2017 Management Case, the Proxy fails to provide a reconciliation of all non-GAAP to GAAP metrics for fiscal years 2017 through 2026. When a company discloses information that includes non-GAAP financial measures, as Akorn does in

the Proxy, it also must disclose comparable GAAP measures and a quantitative reconciliation of forward-looking information. 17 C.F.R. §244.100.

52. The SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders. Former SEC Chair Mary Jo White has cautioned with respect to the frequent use by publicly-traded companies of unique company-specific non-GAAP financial measures: "In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation."

53. With respect to J.P. Morgan's "Discounted Cash Flow Analysis" for the Company, the Proxy fails to disclose: (i) the effect of Akorn's interest on taxes paid; (ii) the basis for applying terminal value growth rates ranging from 0.0% to 2.0%; (iii) the basis for using discount rates ranging from 8.0% to 10.0%; or (iv) the projected net debt as of April 21, 2017.

54. With respect to J.P. Morgan's "Public Trading Multiples," the Proxy fails to disclose: (i) exactly how and why the companies observed were selected by J.P. Morgan; (ii) exactly why J.P. Morgan selected an EV/Adjusted EBITDA 2017E reference range for the Company of 6.0x to 10.0x and the "other factors that J.P. Morgan considered appropriate" to that selection; (iii) exactly why J.P. Morgan selected a price/EPS 2017E reference range for the Company of 7.0x to 15.5x and the "other factors that J.P. Morgan considered appropriate" to that selection; or (iv) exactly how J.P. Morgan derived the EV (enterprise value) for each company observed in the analysis.

55. With respect to J.P. Morgan's "Selected Transaction Analysis," the Proxy fails to disclose: (i) exactly why J.P. Morgan judged the businesses included in the analysis to be analogous to the Company's business; (ii) exactly why J.P. Morgan selected an EV/LTM Adjusted EBITDA multiple reference range for the Company of 8.0X to 17.5X and the "other

factors that J.P. Morgan considered appropriate" in making that selection; or (iii) exactly how J.P. Morgan derived the EV (enterprise value) for each company observed in the analysis.

56.     Moreover, the Proxy states that J.P. Morgan "performed such other financial studies and analyses . . . as J.P. Morgan deemed appropriate for the purposes of its opinion." Proxy at 41. Yet, the Proxy fails to disclose whether it presents all such other financial studies and analyses and, if not, what the substance and conclusions of those studies and analyses were and why J.P. Morgan determined not to include them in its opinion.

57.     Second, the Proxy omits material information concerning potential conflicts of interest affecting the Company's financial advisor, J.P. Morgan. According to the Proxy, during the last two years, J.P. Morgan and its affiliates have had commercial or investment banking relationships with the Company, Fresenius Kabi, and Fresenius Parent for which J.P. Morgan and such affiliates have received "customary compensation." "Such services during such period have included acting as joint lead arranger and bookrunner on Fresenius Parent's €3.7 billion bridge loan closed in January 2017 and joint lead bookrunner on Fresenius Parent's €2.6 billion debt securities offering closed in January 2017. In addition, J.P. Morgan's commercial banking affiliate is an agent bank and a lender under outstanding credit facilities of the Company, "for which it receives customary compensation or other financial benefits." Proxy at 45.

58.     The Proxy fails to disclose: (i) the amounts of compensation J.P. Morgan received for the services it provided to the Company; (ii) the amounts of compensation J.P. Morgan received for the services it provided to Fresenius Kabi or Fresenius Parent; or (iii) whether J.P. Morgan or its affiliates expect to provide any services to Fresenius in the future.

59.     The Proxy also fails to disclose whether the estimated fee of $47 million payable to J.P. Morgan is contingent upon consummation of the Proposed Transaction.

16

60.    In addition, the Proxy states: "In the ordinary course of their businesses, J.P. Morgan and its affiliates may actively trade the debt and equity securities or financial instruments . . . of the Company or the Fresenius Parent for their own accounts or for the accounts of customers and, accordingly, they may at any time hold long or short positions in such securities or other financial instruments." Proxy at 45. Yet, while the Proxy notes that "J.P. Morgan and its affiliates hold, on a proprietary basis, less than 1% of the outstanding common stock of each of the Company and Fresenius Parent" (*id.*), it fails to disclose whether J.P. Morgan or its affiliates are holding long or short positions in securities or financial instruments of the Company or Fresenius Parent for the account of any customers and, if so, the securities or financial instruments held and the extent of such holdings.

61.    The Proxy states that J.P. Morgan will be paid an estimated $47 million in connection with the Proposed Transaction. Proxy at 45. However, according to J.P. Morgan's opinion letter, dated April 24, 2017 (Proxy, Annex F), "a substantial portion" of its fee "will become payable ***only if the proposed Transaction is consummated***." Thus, the financial advisor on which the Board has relied to provide an independent evaluation of the transaction and to opine as to the fairness of the merger consideration to the holders of Akorn common stock has a direct and substantial financial stake in the completion of the Proposed Transaction.

62.    The Proxy fails to disclose what measures, if any, the Board took to assure itself that J.P. Morgan's conflicts of interest did not affect its opinion with respect to the Proposed Transaction or otherwise taint the process that led to the Proposed Transaction.

63.    Third, the Proxy omits material information concerning possible alternatives to the Proposed Transaction.

64.    For example, the Proxy refers to "a list of other remaining potential strategic companies in the pharmaceuticals industry that the Company had not yet contacted and that may

17

have interest in acquiring the Company," which CEO Rai and J.P. Morgan reviewed with the Board at its meeting on December 2, 2016. Proxy at 29. The Proxy, however, fails to disclose any more information concerning the companies on the list or exactly why the Board determined, at the December 2, 2016 meeting, "that it was highly unlikely that any of those counterparties would be interested in an acquisition of the Company at that time due to competing strategic priorities and recent acquisitions in the industry" (with one exception, "Company E"). *Id.*

65.     Based on the foregoing, Akorn's stockholders lack critical information necessary to evaluate whether the Proposed Transaction is in their best interest. Moreover, without the key financial information and related disclosures, Akorn's stockholders cannot gauge the accuracy and reliability of the financial analyses performed by J.P. Morgan and whether they can reasonably rely on its fairness opinion.

66.     Accordingly, Plaintiff seeks, among other things, the following relief: (i) enjoinment of the Proposed Transaction; or (ii) rescission of the Proposed Transaction in the event that it is consummated and to recover damages resulting from Defendants' misconduct.

## CLAIMS ALLEGED

## FIRST CAUSE OF ACTION

**Against All Defendants for Violations of Section 14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder**

67.     Plaintiff repeats and realleges each allegation set forth herein.

68.     As detailed herein, Defendants disseminated the false and misleading Proxy specified above, which contained statements that, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts and which omitted to state material facts necessary in order to make the statements therein not false or misleading or necessary to correct earlier statements which had become false or

misleading, in violation of Section 14(a) of the Exchange Act and SEC Rules promulgated thereunder, including SEC Rule 14a-9.

69. By the use of the mails and by means and instrumentalities of interstate commerce and the facility of a national securities exchange, Defendants solicited and permitted the use of their names to solicit proxies or consents or authorizations with respect to Akorn's common shares.

70. By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy. The Proxy was prepared, reviewed, and/or disseminated by Defendants. The Proxy misrepresented and omitted material facts, including material information about the unfair sale process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's assets. Defendants were at least negligent in filing and disseminating the Proxy with these materially false and misleading statements and omissions. Defendants have also failed to correct the Proxy and the failure to update and correct false statements is also a violation of Section 14 of the Exchange Act and SEC Rules promulgated thereunder.

71. The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding whether to vote in favor of and tender their shares in the Proposed Transaction. A reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

72. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from immediate and irreparable injury, which Defendants' actions threaten to inflict.

## SECOND CAUSE OF ACTION

### Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act

73.     Plaintiff repeats and realleges each allegation set forth herein.

74.     The Individual Defendants acted as controlling persons of Akorn within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their positions as officers and directors of Akorn and their participation in and awareness of the Company's business and operations and their intimate knowledge of the materially false and misleading statements and omissions in the Proxy filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially false and misleading.

75.     Each of the Individual Defendants was provided with, or had access to, copies of the Proxy and other statements alleged by Plaintiff to be materially false and misleading prior to, or shortly after, those statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

76.     In particular, each of the Individual Defendants had direct and supervisory involvement in the Company's day-to-day operations and is, therefore, presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. Among other things, the Proxy at issue contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, they were directly involved in the making of that document.

77.     In addition, as the Proxy sets forth at length and as described herein, each of the Individual Defendants was involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that the

Individual Defendants reviewed and considered – descriptions which had input from the Individual Defendants.

78.     By virtue of the foregoing, each of the Individual Defendants has violated Section 20(a) of the Exchange Act.

79.     Plaintiff has no adequate remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment and preliminary and permanent relief, including injunctive relief, in Plaintiff's favor and against Defendants as follows:

A.     Enjoining Defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Transaction unless and until the Company adopts and implements a procedure or process to obtain the best available terms for shareholders and discloses, completely and accurately, the material information concerning the Proposed Transaction that is now misstated in, or omitted from, the Proxy;

B.     Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff damages;

D.     Directing the Individual Defendants to account to Plaintiff for all damages suffered as a result of the wrongdoing;

E.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.     Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on all issues and in all proceedings so triable.

Dated:  June 13, 2017            **DICELLO LEVITT & CASEY LLC**

By: _/s/ Adam J. Levitt_
Adam J. Levitt
Daniel R. Ferri
Ten North Dearborn Street,
Eleventh Floor
Chicago, Illinois 60602
Telephone: 312-214-7900
alevitt@dlcfirm.com
dferri@dlcfirm.com

**BROWER PIVEN**
  A Professional Corporation
Daniel Kuznicki
475 Park Avenue South, 33rd Floor
New York, New York 10016
Telephone: 212-501-9000
kuznicki@browerpiven.com

_Counsel for Plaintiff_